## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

NETCHOICE,

        Plaintiff,

v.

KEITH ELLISON, in his official capacity, as
Attorney General of Minnesota

        Defendant.

Civil No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff NetChoice, by and through its attorneys, Cahill Gordon & Reindel LLP and Mohrman, Kaardal & Erickson, P.A., alleges for its complaint against the above-named Defendant, as follows:

## NATURE OF THE ACTION

1.     NetChoice challenges the constitutionality and legal validity of Minnesota Statutes §§ 325M.33(1)–(5), which are part of the Minnesota Prohibiting Social Media Manipulation Act (the "Act")—a law that weaponizes transparency to compel speech, curb editorial discretion, and coerce publishers, like the members of NetChoice that are subject to the Act's requirements ("covered members" or "members"), into adopting State-preferred platform design and messaging.[1]  Taken together, the Act's requirements commandeer private publishers to disseminate the State's views and overrule protected editorial choices.

---

[1] The Act is codified at Minnesota Statutes §§ 325M.30 through 325M.34, available at https://www.revisor.mn.gov/statutes/cite/325M.  For the Court's convenience, the Act is provided in its entirety as Exhibit 1.

2.      Like other States before it, Minnesota enacted the Act to control online speech under the guise of promoting the public good.  *See, e.g.*, *NetChoice* v. *Carr*, 2025 WL 1768621 (N.D. Ga. June 26, 2025); *NetChoice, LLC* v. *Fitch*, 2025 WL 1709668 (S.D. Miss. June 18, 2025); *Comput. & Commc'ns Indus. Ass'n* v. *Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC* v. *Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *NetChoice, LLC* v. *Yost*, 2025 WL 1137485 (S.D. Ohio Apr. 16, 2025); *NetChoice, LLC* v. *Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC* v. *Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024); *Comput. & Commc'ns Indus. Ass'n* v. *Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024).

3.      And like other lawmakers before them, Minnesota said the unconstitutional quiet part out loud.  *See, e.g.*, *Moody* v. *NetChoice*, 603 U.S. 707, 727 (2024) (noting that Texas "has never been shy, and always been consistent, about its interest: The objective is to correct the mix of speech that the major social-media platforms present").   Here, as the Act's sponsor, Representative Zack Stephenson, has made clear,[2] the Act itself results directly from the two-part Report of Attorney General Keith Ellison, entitled *Minnesota Attorney General's Report on Emerging Technology and Its Effects on Youth Well-Being*,[3] the central premise of which is that

---

[2] *See* Ex. 2 (MNHouse Info, *House Judiciary Finance and Civil Law Committee 3/14/24*, at 51:27–51:42 (YouTube, Mar. 14, 2024), https://www.youtube.com/watch?v=W2hg8wqK91E) (Rep. Stephenson stating that the bill "results from a report that we instructed the Attorney General to prepare last year related to social media, particularly its impact on mental health, particularly for young people").  All exhibit transcripts, which were downloaded directly from the websites, are auto-generated and uncertified.  The transcripts and audios were reviewed to confirm the accuracy of the portions quoted herein.

[3] *See* Ex. 3 (*Minnesota Attorney General's Report on Emerging Technology and Its Effect on Youth Well-Being,    Vol.    1*,    Minnesota    Attorney    General    (Feb.    2024), https://www.ag.state.mn.us/Office/Reports/EmergingTechnology.pdf ("AG 2024 Report")); Ex. 4 (*Minnesota Attorney General's Report on Emerging Technology and Its Effect on Youth Well-Being,    Vol.    2*,    Minnesota    Attorney    General    (Feb.    2025), https://www.ag.state.mn.us/Office/Reports/EmergingTechnology_2025.pdf    ("AG    2025 Report")).

the State of Minnesota must take action to address what the Attorney General asserts are the "manipulative and addictive functional design features" of social media platforms. AG 2025 Report at 4.

4.      Even the Attorney General concedes that whether and how speech-product design decisions harm users is a matter of ongoing public controversy. *See* AG 2025 Report at 8. This alone puts the provisions at issue within the category of compelled disclosures that warrant strict scrutiny. *See Nat'l Inst. of Fam. & Life Advocates v. Becerra* ("*NIFLA*"), 585 U.S. 755, 768–69 (2018) (compelled disclosures must be "purely factual and uncontroversial" for exception to strict scrutiny to apply). [4]

5.      Given that strong animus, it is no wonder the Act engages in unconstitutional speaker-, viewpoint-, and content-based discrimination targeting politically disfavored online publishers, while cynically carving out similarly situated speakers without any justification. *See Sorrell* v. *IMS Health*, 564 U.S. 552, 565–66 (2011) (speaker-based restrictions trigger heightened scrutiny); *Reed* v. *Town of Gilbert*, 576 U.S. 155, 163 (2015) (content-based restrictions presumptively invalid). The Act's definition excludes "streaming services" and "online video games" that engage in identical or nearly identical algorithmic curation and user engagement practices. § 325M.31(j)(4). This selective application reveals the State's disapproval of social media publishers' particular editorial viewpoints—including the view that user engagement and social interaction are priorities—and their preference for "professionally produced" speech available on, say, Hulu or Disney+ over user-generated speech found on social media. Such

---

[4] Unless otherwise indicated, emphases in quotes are added and internal citations and quotations are omitted.

distinctions also violate the First Amendment's core prohibition on government favoritism in the marketplace of ideas. *See Police Dep't of Chicago* v. *Mosley*, 408 U.S. 92, 95–96 (1972).

6.     The State has clearly taken a side in this debate, arguing in both the AG 2024 and 2025 Reports that many of social media companies' design features and algorithms cause substantial harm to consumers by "tricking" or "manipulating" them into using social media more than they want to, encouraging addictive use of their products, and exposing users to harms that result from these efforts to keep people on the platforms. *See, e.g.*, AG 2024 Report at 7; AG 2025 Report at 8. The AG 2024 and 2025 Reports conclude that the State must implement a "modern regulatory response," AG 2024 Report at 4, to the companies' efforts to persuade people to use their products, and the provisions of the Act that NetChoice is challenging are part of that proposed "regulatory response."

7.     The State's entire approach is one that simply ignores well-established and deeply rooted First Amendment principles. The government may not censor or penalize publishers—even social media companies—for encouraging lawful engagement with expressive content. *See, e.g.*, *Central Hudson Gas & Elec.* v. *PSC*, 447 U.S. 557, 564–66 (1980); *Moody*, 603 U.S. at 719, 733. And the government may not suppress speech that falls outside of a traditional First Amendment exception such as obscenity "solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Brown* v. *Ent'mt Merchants Ass'n*, 564 U.S. 786, 795 (2011) (striking down regulation of violent video games for children) (quoting *Erznoznik* v. *Jacksonville*, 422 U.S. 205, 213–14 (1975)). These principles apply with equal force online, as any "intrusion into" a social media company's editorial discretion "must be specially justified under the First Amendment." *Moody*, 603 U.S. at 730.

4

8.      In fact, developing and using proprietary algorithms in this context is a form of protected speech.  The algorithms implement editorial decisions about what content to display, to whom, and when, at scale—precisely the type of expressive activity the Court recognized in *Moody*, 603 U.S. at 744, and previously protected in cases like *Hurley* v. *Irish-American GLB Group*, 515 U.S. 557, 570 (1995).  This protection does not fade away merely because some publishers, like social media companies, also earn revenue from their speech products.  *See, e.g.*, *Harte-Hanks Commc'ns, Inc.* v. *Connaughton*, 491 U.S. 657, 667 (1989) ("If a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."); *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988) ("[T]he degree of First Amendment protection is not diminished merely because the newspaper or speech is sold rather than given away."); *Va. State Bd. of Pharmacy* v. *Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761 (1976) ("Speech . . . is protected [by the First Amendment] even though it is carried in a form that is 'sold' for profit . . ."); *Joseph Burstyn, Inc.* v. *Wilson*, 343 U.S. 495, 501 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First Amendment.").  To the contrary, the First Amendment has always protected publishers' right to market their speech products or services to communicate a core message: "use *our* product or service," not theirs.  Indeed, a contrary conclusion would strip commercial, speech- enterprises like the *New York Times* or *Minneapolis Star* of First Amendment protection merely because they publish speech for profit.

9.      The Attorney General, however, believes that users exposed to this speech cannot make choices that are in their own best interests because the speech of the social media companies

"manipulate[s] users into making choices they would not otherwise have made and that may cause harm."  AG 2025 Report at 8; AG 2024 Report at 7.

10.     The Attorney General's speech-police regime violates core First Amendment principles rejecting government paternalism in the marketplace of ideas.  *See Va. State Bd. of Pharmacy*, 425 U.S. at 770 ("It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us."); *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 497, 503 (1996) (rejecting "highly paternalistic approach" that assumes consumers cannot evaluate commercial messages).  In fact, NetChoice covered member X Corp. recently and successfully challenged similar paternalistic regulations in *X Corp.* v. *Bonta*, 116 F.4th 888 (9th Cir. 2024), where the Ninth Circuit rejected California's attempt to second-guess and indirectly regulate online publishers' editorial decisions. Even in the context of pure commercial speech, the Supreme Court has expressly rejected the "highly paternalistic view that government has complete power to suppress or regulate commercial speech," because, under First Amendment principles, the "best means" to a fully informed populace is "to open the channels of communications rather than to close them."  *Central Hudson*, 447 U.S. at 560.

11.     The AG 2024 and 2025 Reports make numerous policy recommendations, all of which are designed to have the State intervene and limit the ability of websites to interact with users, present and publish content, and convey their viewpoints.  The State's recommendations all involve government intervention that directly or indirectly attempts to alter the messages social media platforms can send to encourage use of their products or replace them with the State's paternalistic and supposedly "better for you" messaging.

6

12.     The AG 2024 and 2025 Reports recommend regulations that would directly violate the First Amendment by dictating online publishers' editorial choices—the very conduct the Supreme Court recently protected in *Moody*.  They propose that the State:

- ban design features that relate to "revenue and usage maximization," rather than to "the explicit choices or preferences of users" (AG 2024 Report at 23; AG 2025 Report at 31);

- mandate default privacy features that will supposedly limit unwanted communications, because users "often do not understand enough about their choices to provide consent" (AG 2024 Report at 23–24; AG 2025 Report at 31–32);

- mandate that algorithms stop prioritizing content that maximizes engagement (i.e., that people ***actually*** engage with) and instead prioritize content that people *say* they want to engage with (AG 2024 Report at 24–25; AG 2025 Report at 32);

- compel disclosures regarding limits on the number of posts users can make (i.e., "rate limits") to prevent "a small group of motivated partisans" or "untrusted users" from "dominat[ing] . . . conversation[s]" or "target[ing] or influenc[ing] others" (AG 2024 Report at 25; AG 2025 Report at 33); and

- compel disclosures of product experiments that might reveal additional efforts to (in the Attorney General's view) "manipulate" users to make choices that they do not want to make (AG 2024 Report at 25; AG 2025 Report at 33–34).

13.     In addition to inflicting irreparable First Amendment injury, these compelled disclosure requirements would inflict irreparable competitive and operational harm on NetChoice's covered members.  Forced disclosure of algorithmic processes would enable competitors to reverse-engineer proprietary innovations, destroying competitive advantages built through substantial investment.  *See FMC Corp.* v. *Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (trade secret disclosure causes irreparable harm because a "trade secret once lost is, of course, lost forever"); *Kremers* v. *Dahl*, 2014 WL 273966, at *6 (Minn. Ct. App. Jan. 21, 2014) ("[I]njunctions can prevent the irreparable harm from misappropriation of a trade secret.").  The worldwide statistics required by Section 325M.33(3) would necessitate costly data

compilation and processing, diverting resources from speech-product improvement and content moderation. *See NetChoice, LLC* v. *Bonta*, 113 F.4th 1101, 1120–21 (9th Cir. 2024) (noting compliance burden of disclosure requirements). And the Act's deliberately controversial framing would subject publishers to public opprobrium and regulatory pressure inflamed by the Act's own compelled-speech mandates, further chilling the exercise of editorial judgment. These harms cannot be remedied through post-enforcement damages, making injunctive relief essential. *See, e.g.*, *Roman Cath. Diocese of Brooklyn* v. *Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

14.     When first introduced, the Act included provisions that adopted all these policy recommendations, *see* Ex. 5 (HF 4400, Sec. 4, 93rd Leg. (Minn. 2024), available at https://www.revisor.mn.gov/bills/text.php?number=HF4400&version=0&session=ls93&session_ year=2024&session_number=0), but the bill was eventually amended to include only mandatory "compelled disclosure requirements," which are designed to pressure the platforms to make the very types of changes endorsed by the AG 2024 and 2025 Reports, thus paternalistically "protecting" consumers from commercial speech designed to encourage them to stay on the platforms.

15.     This lawsuit challenges the compelled disclosure regime that survived into the final version of the Act—a regime designed to chill speech-enhancing design decisions and to pressure online publishers into conformity. The compelled disclosure requirements challenged include:

- Disclosures about how the platforms' impose limits on user engagement per hour, day, week, and month, and whether and how the platforms' proprietary algorithms reduce the ability of accounts to affect other users when users engage in a high number of account interactions that are below the maximum limit (§ 325M.33(1));

- Disclosures about how the platforms' proprietary algorithms assess and weigh the quality of content, users preferences about content, and other variables in the algorithmic ranking system (§ 325M.33(2));

- Detailed statistics about how much the 10th, 25th, 50th, 75th, 90th, 95th, 99th, and 99.9th percentile of all account holders (a) sends invitations or messages to other account holders; (b) comments on, reshares, likes, votes for, or otherwise reacts to content; (c) posts new user-generated content; (d) disseminates user-generated content to other account holders; and (e) spends time on the platform (§ 325M.33(3));

- An explanation of how the platform determines whether notifications to users are time-sensitive and non-time-sensitive, and detailed statistics about how many of each such notification is sent to users each day and between 11pm and 7am (§ 325M.33(4)); and

- Descriptions of all product experiments conducted on 1,000 users or more, including the experimental conditions and results (§ 325M.33(5)).

16. These compelled disclosure requirements violate the First Amendment many times over. For starters, the State of Minnesota is attempting to leverage the ongoing controversial debate about the supposed benefits and harms of the emerging technologies used by social media platforms to force the platforms to speak in ways they otherwise would not. Worse yet, as the Act's official title (the "Prohibiting Social Media Manipulation Act") makes plain, the compelled disclosures fit the State's narrative, embodied in the AG 2024 and 2025 Reports and rejected by NetChoice and its covered members, suggesting that the social media companies engage in practices that "manipulate" and harm viewers by supposedly "coercing" them into staying on social media more than they actually want to, or, in the paternalistic view of the State, more than they would want to if they only knew what was best for them. Such compelled disclosures violate the rights of NetChoice's covered members under the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution.

17. As the United States Supreme Court recently held in *Moody*, 603 U.S. 707, when social media platforms "present[] a curated and 'edited compilation of [third party] speech,'" that

presentation "is itself protected speech." *Id.* at 744; *see also, e.g.*, *id.* at 738 ("The choice of material, the decisions made [as to] content, the treatment of public issues—whether fair or unfair—all these constitute the exercise of editorial control and judgment. . . . For a paper, and ***for a platform too***."); *id.* at 729–30 ("A private party's collection of third-party content into a single speech product (the operators' 'repertoire' of programming) is itself expressive, and intrusion into that activity must be specially justified under the First Amendment.").

18.     Thus, a social media platform's content algorithm—which is created by the social media platforms to implement their curation, dissemination, and presentment decisions at scale—is speech protected under the First Amendment. *See, e.g.*, *Junger* v. *Daley*, 209 F.3d 481, 485 (6th Cir. 2000) ("Because computer source code is an expressive means for the exchange of information and ideas about computer programming, we hold that it is protected by the First Amendment."); *Universal City Studios, Inc.* v. *Corley*, 273 F.3d 429, 436 (2d Cir. 2001) ("computer code is 'speech' entitled to full First Amendment protection," particularly when it has a communicative component). Courts have consistently recognized that using data to create speech or algorithms to disseminate speech is protected expression. *See Sorrell*, 564 U.S. at 570 (data mining and analysis constitute protected speech); *Search King, Inc.* v. *Google Tech., Inc.*, 2003 WL 21464568, at *4 (W.D. Okla. May 27, 2003) (search engine rankings are protected opinion); *Langdon* v. *Google, Inc.*, 474 F. Supp. 2d 622, 629–30 (D. Del. 2007) (same).

19.     Minnesota cannot compel disclosure of these protected editorial algorithms any more than it could compel a newspaper to reveal its editorial decision-making process. Those First Amendment protections exist whether the algorithm is programmed to limit the reach of certain harmful speech or conduct, enforce the platform's content-moderation rules, create a pleasant experience for users, or—as is the right of every legal commercial enterprise—to urge people to

stay on and engage with the product (here, the online publisher).  *See, e.g.*, *Miami Herald Pub. Co.* v. *Tornillo*, 418 U.S. 241, 258 (1974) ("The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment.  It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time."); *Moody*, 603 U.S. at 738 (holding that this principle applies "[f]or a paper, and for a platform too.").

20.     The disclosures here are not "mere" transparency measures designed to help the public make informed decisions.  The average person would not have the slightest idea what to do with, to take just one example from Section 325M.33(3), detailed statistics about worldwide user engagement on social media platforms broken down into eight different percentiles, or know what those statistics would say about the likelihood of being exposed to allegedly "harmful" or unwanted content.  Accordingly, the Act's compelled disclosures are not even "reasonably related to the State's interest in preventing deception of consumers."  *1-800-411-Pain Referral Serv., LLC* v. *Otto*, 744 F.3d 1045, 1062 (8th Cir. 2014) (quoting *Zauderer* v. *Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 651 (1985)).

21.     The obvious purpose and intended effect of these disclosures is to coerce social media companies—through both the Attorney General and the public—to make the types of changes to their algorithms, design features, and messaging that the State desires.  The Act itself and the legislative history make this abundantly clear.

22.     The very title of the Act, the "Prohibiting Social Media Manipulation Act," *see* § 325M.30, leaves no doubt that Section 325M.33's compelled disclosure requirements are

intended to deter covered platforms from using the product features and messaging outlined in the AG 2024 and 2025 Reports and characterized pejoratively as "manipulation" by the State. And the AG 2024 and 2025 Reports, which form the basis for the legislation, confirm that the State intends to use this information to pressure the companies to make such changes. If there were any doubt, the public comments by Attorney General Ellison make clear how he intends to use the Act. Upon publication of the AG 2024 Report, the Attorney General issued a press release stating that "I will continue to use all the tools at my disposal to prevent ruthless corporations from preying on our children. I hope other policymakers will use the contents of this report to do the same."[5]

23.     The State could not, consistent with the First Amendment, directly regulate the practices highlighted in the AG 2024 and 2025 Reports. The legislature implicitly recognized this when it amended the Act to strip away the provisions calling for such direct regulation. But the State also may not, as it has done here, use so-called mandated transparency laws to attempt to achieve "indirectly what [it] is barred from doing directly." *Nat'l Rifle Ass'n of Am.* v. *Vullo*, 602 U.S. 175, 190 (2024); *see also Bantam Books, Inc.* v. *Sullivan*, 372 U.S. 58, 67–69 (1963) (government cannot use indirect pressure to achieve unconstitutional results). Indeed, as X Corp. argued—and won—in *X Corp.* v. *Bonta*, transparency requirements designed to pressure editorial changes are impermissible regardless of their indirect nature. *See* 116 F.4th at 899 n.8.

24.     The Act also violates the unconstitutional conditions doctrine by conditioning online publishers' ability to operate in Minnesota on surrendering their First Amendment rights to editorial autonomy and trade secret protection. *See Perry* v. *Sindermann*, 408 U.S. 593, 597 (1972) (government "may not deny a benefit to a person on a basis that infringes his constitutionally

---

[5] Ex. 6 (*Attorney General Ellison Releases Report on Social Media and AI's Effect on Young People*, Off. Minn. Att'y Gen. (Feb. 1, 2024), https://www.ag.state.mn.us/Office/Communications/2024/02/01_EmergingTechReport.asp).

protected interests"); *Koontz* v. *St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604–05 (2013) (extending doctrine to regulatory context). Nor can the State require publishers to disclose protected editorial processes as the price of serving Minnesota users. *See Rumsfeld* v. *Forum for Academic & Institutional Rights*, 547 U.S. 47, 59–60 (2006) (government cannot condition funding on waiver of speech rights). This principle applies with equal force whether the condition involves government benefits or regulatory permission to operate.

25.     The Act tramples on NetChoice's covered members' solidified First Amendment rights. It "is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." *Hustler Mag., Inc.* v. *Falwell*, 485 U.S. 46, 56 (1988). And while the government is free to chime in and express its own views about the benefits or harms it believes are associated with certain products, it may not commandeer or burden the messages of commercial enterprises to conform with its own views, thus interfering with the marketplace of ideas. *See Va. State Bd. of Pharmacy*, 425 U.S. at 763 (holding that a consumer's "interest in the free flow of commercial information . . . may be as keen, if not keener by far, than his interest in the day's most urgent political debate"); *Uthmeier*, 2025 WL 1570007, at *18–19 (striking down Florida law under intermediate scrutiny where a State "public education campaign" was a "substantially less burdensome alternative[]"). Here, the State is trying to limit the social media platforms' editorial rights to design their algorithms to provide users with content that they will actually engage with. As the Act and its legislative history make clear, the mandated disclosures in the Act are an impermissible part of that effort.

26.     Even worse, the disclosures are about a subject that engenders significant nationwide—even global—controversy. As the AG 2025 Report acknowledges, there is intense debate about whether emerging technologies used by social media companies are good or bad for

people on average, AG 2025 Report at 8, and that debate is over "anything but an 'uncontroversial' topic." *NIFLA*, 585 U.S. at 769; *see also Book People, Inc.* v. *Wong*, 91 F.4th 318, 340 & n.127 (5th Cir. 2024) (compelled disclosures of library-material ratings were controversial and likely violated the First Amendment where the ratings had in fact "already proven controversial," including because legislative hearings about the law "garnered media attention"). The disclosures force NetChoice's covered members to speak out publicly about these controversial issues in ways that allow the State to frame the debate around what it erroneously alleges to be harmful or "manipulative" messaging. In other words, the compelled disclosure requirements of the Act make private publishers the mouthpiece of the State's views—and even force them to admonish and denigrate themselves publicly in the process. *See, e.g.*, *NetChoice, LLC*, 113 F.4th at 1118 (the government may not "deputize[] covered businesses into serving as censors for the State").

27.    This is prohibited under the First Amendment. *See, e.g.*, *Jewell* v. *Herke*, 526 F. Supp. 3d 459, 468 (D. Minn. 2021) (denying motion to dismiss First Amendment claim over requirement for persons providing paid veteran benefits to disclose that benefits could be obtained for free, finding that the compelled disclosure went "beyond providing 'purely factual and uncontroversial information,'" instead "cross[ing] the line into compelled advocacy regarding a controversial issue"); *X Corp.*, 116 F.4th at 901 (striking down California compelled disclosure law under strict scrutiny that required social media companies to "recast [their] content-moderation practices in language prescribed by the State, implicitly opining on whether and how certain controversial categories of content should be moderated"); *NetChoice, LLC*, 113 F.4th at 1119 (striking down California law under strict scrutiny that forced covered businesses to "opine on potential speech-based harms to children").

14

28.     "'[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles' of the First Amendment 'do not vary.'" *Moody*, 603 U.S. at 733. The First Amendment "prevent[s] *the government* from 'tilt[ing] public debate in a preferred direction.'" *Id.* at 741 (emphasis in original) (quoting *Sorrell*, 564 U.S. at 578–579); *see also id.* at 734 ("[G]overnment may not, in supposed pursuit of better expressive balance, alter a private speaker's own editorial choices about the mix of speech it wants to convey."); *id.* at 719 ("[I]t is no job for government to decide what counts as the right balance of private expression—to 'un-bias' what it thinks biased, rather than to leave such judgments to speakers and their audiences. That principle works for social-media platforms as it does for others."); *id.* at 733 ("[h]owever imperfect the private marketplace of ideas," a "worse proposal" is "the government itself deciding when speech [is] imbalanced, and then coercing speakers to provide more of some views or less of others").

29.     The Act's compelled disclosure requirements are also unconstitutionally vague, as many terms of the statute are so unclear (e.g., how social media platforms determine the "quality of content" on their platforms) that a person of ordinary intelligence would not understand what the required disclosures are.  The Act thus allows—encourages, really—arbitrary or discriminatory enforcement by the Attorney General.  *See Fantasysrus 2, L.L.C.* v. *City of E. Grand Forks, Minn.*, 881 F. Supp. 2d 1024, 1032 (D. Minn. 2012) (citing *United States* v. *Williams*, 553 U.S. 285, 304 (2008)).  It is yet another backdoor for the State to leverage its enforcement power to try indirectly what it is prohibited from doing directly: controlling the online marketplace of ideas and how users engage with it.

30.     The Act's compelled disclosure requirements also violate the Takings Clause under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 13,

of the Minnesota Constitution, because they force NetChoice's covered members to divulge to the public highly sensitive and confidential trade-secret information about product experiments and how the platforms' proprietary algorithms work, without providing the covered members any compensation.

31.     The Act's compelled disclosure requirements also suffer from additional constitutional infirmities, including, as outlined below, violations of the Dormant Commerce and Due Process Clauses of the U.S. Constitution.

32.     In sum, the Act's compelled disclosure requirements violate the (1) First and Fourteenth Amendments of the U.S. Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to Plaintiff's covered members; (2) First and Fourteenth Amendments of the U.S. Constitution, on vagueness grounds; (3) Takings Clause under the Fifth and Fourteenth Amendments of the U.S. Constitution and Article 1, Section 13, of the Minnesota Constitution, because it forces NetChoice's covered members to divulge their trade-secret property to the public without just compensation; and (4) Dormant Commerce and Due Process Clauses of the U.S. Constitution, by imposing a burden on interstate commerce that is excessive in relation to any local benefit.

33.     In pursuing this action, NetChoice seeks to vindicate the deprivation of constitutional rights under color of state statute, ordinance, regulation, custom, and/or usage. NetChoice is also entitled to attorneys' fees and costs if it prevails on any of its Section 1983 claims. *See* 42 U.S.C. § 1988.

## PARTIES & STANDING

34.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies. Its members include numerous "social media platforms," as defined under the Act,

whose rights are violated by the Act's compelled disclosure requirements.[6]  NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while also minimizing the burdens that would prevent businesses from making the Internet more accessible and useful.  NetChoice has frequently brought legal challenges to legislation, like the Act, that violates the constitutional rights of Internet companies and hurts their businesses.

35.     NetChoice has associational standing to challenge the Act, because (1) some of NetChoice's members have individual standing to sue; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge.  *See Hunt* v. *Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Heartland Acad. Cmty. Church* v. *Waddle*, 427 F.3d 525, 532–33 (8th Cir. 2005).

36.     The "social media platform[s]" that are subject to the Act—*see* §§ 325M.31(j), 325M.32—include, at least, the following NetChoice members: (1) X Corp., which owns and operates X; (2) Google, which owns and operates YouTube; (3) Discord; (4) Meta, which owns and operates Facebook and Instagram; (5) Nextdoor; (6) Pinterest; (7) Reddit; and (8) Snap Inc., which owns and operates Snapchat.  Each covered member meets the definition of "social media platform" under Section 325M.31(j), does business in Minnesota or provides products or services that are targeted to residents of Minnesota under Section 325M.32(a)(1), and has more than 10,000 monthly active account holders in Minnesota under Section 325M.32(a)(2).

37.     Defendant Keith Ellison is the Attorney General of the State of Minnesota and is charged with enforcing the Act.  *See* § 325M.34(a).  NetChoice sues Attorney General Ellison in his official capacity as the person charged with enforcing the Act.

---

[6] A complete list of NetChoice's members can be found at https://netchoice.org/about/.

## JURISDICTION

38.     This Court has jurisdiction over NetChoice's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a) and 42 U.S.C. § 1983, because NetChoice alleges violations of its members' rights under the United States Constitution.  The Court has jurisdiction over NetChoice's state claims pursuant to 28 U.S.C. § 1367.

39.     This Court has authority to grant declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and under the Court's inherent equitable jurisdiction.

## VENUE

40.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2) because the Defendant is located, resides, and has offices in this judicial district and in the State of Minnesota, and the violations of NetChoice's covered members' rights are occurring and will occur within this judicial district.  The Act was also enacted in this judicial district.

## FACTUAL ALLEGATIONS

### I.    The Statutory Scheme

41.    The Act's compelled disclosure requirements apply to "social media platforms" (*see* § 325M.33), which are defined as an "electronic medium, including a browser-based or application-based interactive computer service, Internet website, telephone network, or data network, that allows an account holder to create, share, and view user-generated content for a substantial purpose of social interaction, sharing user-generated content, or personal networking." § 325M.31(j).[7]

42.    A social media platform is subject to the Act if it (1) does business in Minnesota or provides products or services that are targeted to Minnesota residents and (2) has more than 10,000 monthly active account holders located in Minnesota.  § 325M.32(a).

43.    The Act describes the compelled disclosure requirements as "transparency requirements for social media platforms" in Section 325M.33.  Under that provision, platforms must "publicly and conspicuously post" on their websites five categories of information:

> a. ***First***, an explanation of how the social media platform "limits excessive account interactions,"[8] including (1) "the maximum limit on the number of times that a user

---

[7]    Under Section 325M.31(j)(1)–(13), excluded from the Act's definition of "social media platform" are: (1) internet search providers, (2) internet service providers, (3) email services, (4) streaming services, online video games, e-commerce, and other internet websites where the content is not user generated but where interactive functions enable chat, comments, reviews, or other interactive functionality that is incidental to, directly related to, or dependent upon providing the content, (5) communication services, including text, audio, or video communication technologies, provided by a business to the business's employees and clients for use in the course of business activities and not for public distribution, (6) advertising networks with the sole function of delivering commercial content, (7) telecommunications carriers (8) broadband services, (9) single-purpose community groups for education or public safety, (10) teleconferencing or video-conferencing services that allow reception and transmission of audio and video signals for real-time communication, (11) cloud computing services, which may include cloud storage and shared document collaboration, (12) providing or obtaining technical support for a platform, product, or

can engage[9] in each specific kind of account interaction in an hour, day, week, and month," and (2) "whether and how the platform engages in any reduction in the ability of accounts to affect other users when the user engages in a high number of account interactions that is below the maximum limit." § 325M.33(1).

b. **Second**, an explanation detailing how the platform (1) "assesses the quality of content,"[10] (2) "assesses users' expressed preferences[11] regarding content," and (3) "utilizes" those "assessments" in "each of the social media platform's algorithmic

---

service, and (13) platforms designed primarily and specifically for creative professional users, as distinct from the general public, to share their portfolio and creative content, engage in professional networking, acquire clients, and market the creative professional user's creative content and creative services through facilitated transactions.

[8] "Account interactions" means "any action that a user can make within a social media platform that could have a negative impact on another account holder," and "include but are not limited to: (1) sending messages or invitations to users; (2) reporting users; (3) commenting on, resharing, liking, voting, or otherwise reacting to users' user-generated content; and (4) posting user-generated content or disseminating user-generated content to users." § 325M.31(d). Account interactions do not include "[a]ctions that have no impact on other users, including viewing user-generated content or public content[.]" § 325M.31(d). These definitions show the Act's facial hostility to social media platforms. "Account interactions" are defined as interactions that "could" harm others, even though those same interactions could just as easily benefit others.

[9] "Engage" or "engagement" means a "user's utilization of the social media platform." § 325M.31(h).

[10] "Content" means "any media, including but not limited to written posts, images, visual or audio recordings, notifications, and games, that a user views, watches, listens to, or otherwise interacts or engages with on a social media platform. Content includes other account holders' accounts or profiles when recommended to a user by the social media platform." § 325M.31(g).

[11] "Expressed preferences" means "a freely given, considered, specific, and unambiguous indication of a user's preferences regarding the user's engagement with a social media platform. Expressed preferences must not be based on the user's time spent engaging with content on the social media platform or on the use of features that do not indicate explicit preference, including comments made, posts reshared, or similar actions that may be taken on content the user perceives to be of low quality. Expressed preferences must not be obtained through a user interface designed or manipulated with the substantial effect of subverting or impairing a user's decision making." § 325M.31(i).

ranking system,[12] including how the assessments are weighted in relation to other signals in the algorithmic ranking system." § 325M.33(2).

   c. ***Third***, "statistics on the platform's use with respect to the tenth, 25th, 50th, 75th, 90th, 95th, 99th, and 99.9th percentile of all platform account holders for each distinct type of account interaction or engagement, including but not limited to:" (1) "sending invitations or messages to other platform account holders," (2) "commenting on, resharing, liking, voting for, or otherwise reacting to content," (3) "posting new user-generated content," (4) "disseminating user-generated content[13] to other platform account holders," and (5) "time spent on the platform." § 325M.33(3).

   d. ***Fourth***, an explanation of how the platform "determines whether a notification is time sensitive[14] and how many time-sensitive and non-time-sensitive notifications are sent to users including:" (1) "how many time-sensitive and non-time-sensitive notifications are sent with respect to the tenth, 25th, 50th, 75th, 90th, 95th, 99th, and 99.9th percentile of all platform account holders in a given day," and (2) "how many time-sensitive and non-time-sensitive notifications are sent with respect to the tenth, 25th, 50th, 75th, 90th, 95th, 99th, and 99.9th percentile of all platform

---

[12] "Algorithmic ranking system" means "a computational process, including one derived from algorithmic decision making, machine learning, statistical analysis, or other data processing or artificial intelligence techniques, used to determine the selection, order, relative prioritization, or relative prominence of content from a set of information that is provided to a user on a social media platform, including search results ranking, content recommendations, content display, or any other automated content selection method." § 325M.31(e).

[13] "User-generated content" means "any content created by an account holder that is uploaded, posted, shared, or disseminated on the social media platform." § 325M.31(m).

[14] "Time-sensitive" means "content that is welcomed under a user's expressed preferences and that has significantly reduced value to the user with the passing of time." § 325M.31(k).

account holders during each hour between the hours of 11:00 p.m. and 7:00 a.m." § 325M.33(4).

e. *Fifth*, a description of "all product experiments that have been conducted on 1,000 or more users,[15] including a description of the experimental conditions and the results of the product experiment for all experimental conditions on users' viewing or engaging with content that:" (1) "users indicate to be high or low quality," (2) "users indicate complies or does not comply with the users' expressed preferences," or (3) "violates platform policies." § 325M.33(5).

44.    *Finally*, under the Act, the Minnesota Attorney General "may investigate and bring an action against a social media platform for an alleged violation of section 325M.33." § 325M.34(a). The Act does not specify what relief the Attorney General may obtain in such an action.

## II. NetChoice's Covered Members Guard As Trade Secrets The Highly Confidential Information Targeted By The Act

45.    X, YouTube, Discord, Facebook, Instagram, Nextdoor, Pinterest, Reddit, and Snapchat each employ highly technical, proprietary algorithms that, among other things, determine the type of content that a user sees on their platforms. Those algorithms constitute trade secrets.

46.    Certain of the Act's compelled disclosure requirements force NetChoice's covered members to divulge extremely valuable and confidential information about the platforms' proprietary algorithms. For example, the disclosures required by Section 325M.33(1) include an explanation of whether and how the platforms limit engagement for heavy users; those required by Section 325M.33(2) include information about how platforms assess the quality of content,

---

[15] "User" means a "natural person who is located in Minnesota and who holds an account or profile with a social media platform." § 325M.31(l).

users' preferences about content, and how those variables are ranked compared to other variables in the platform's algorithmic ranking system; and those required by Section 325M.33(4) include explanations about how platforms decide whether or not a notification is time sensitive, along with statistics about how many time-sensitive and non-time-sensitive notifications are sent.

47.    Separately, Section 325M.33(5) requires disclosures about all product experiments performed on 1,000 or more users, including a description of the experimental conditions and results. Those experiments are typically performed to guide decisions about whether and how to modify or change NetChoice's covered members' proprietary algorithms.

48.    The information outlined in the prior two paragraphs are trade secrets under Minnesota law. *See, e.g.*, *Wyeth* v. *Nat. Biologics, Inc.*, 2003 WL 22282371, at *19 (D. Minn. Oct. 2, 2003) ("[F]or information to qualify as a trade secret: (1) the information must be neither generally known nor readily ascertainable; (2) the information must derive independent economic value from secrecy; and (3) the plaintiff must make reasonable efforts to maintain secrecy."), *aff'd*, 395 F.3d 897 (8th Cir. 2005).

49.    In fact, the AG 2025 Report acknowledges that compelling the disclosure of "[p]roduct experimentation results," as is required by Section 325M.33(5), may interfere with a platform's "legitimate need to protect trade secrets." AG 2025 Report at 33.

50.    Each covered member keeps the information about their proprietary algorithms and experiments described in Paragraphs 46–47 confidential and the information is valuable, in large part, because it is kept secret from people outside the company. Absent the compelled disclosure requirements of the Act, NetChoice's covered members would not disclose this information to anyone outside the company without a strict confidentiality agreement, let alone publish it publicly.

51.     Each covered member also invests heavily, with great expense, in data security and ensures that the information about their proprietary algorithms and experiments described in Paragraphs 46–47 is not generally accessible even to certain employees within the company. Similarly robust protections are applied to all external parties.

52.     The information about NetChoice's covered members' proprietary algorithms and experiments described in Paragraphs 46–47 is extremely valuable and has been developed at great expense to the covered members.

53.     Under no circumstance would any of NetChoice's covered members voluntarily make this information publicly available.

54.     The Act's compelled disclosure requirements would make these trade secrets public and provide no compensation in return.

## III.    The Act Excessively And Unduly Burdens NetChoice's Covered Members' Nationwide And Global Activities

55.     The Act is a Minnesota state law, but it imposes an unduly burdensome disclosure regime, backed by the threat of investigation and lawsuits, that is national and international in scope.

56.     The undue burden that the Act places on NetChoice's covered members is compounded by the Act's failure to limit its compelled disclosure requirements to information about Minnesotans, or even Americans.  For instance, Section 325M.33(3) compels the disclosure of highly sensitive statistics, which will be burdensome to compile, with respect to "***all platform account holders***."  § 325M.33(3).

57.     The information compelled by the Act is generally not limited to Minnesotans or Americans.  The Act thus fails to take into account that design features and algorithms often vary worldwide.  And statistics about platform users in foreign countries, such as Myanmar and Laos,

24

will not necessarily be meaningful or shed any relevant light on practices in Minnesota or the United States, let alone statistics that combine information about users worldwide without breaking out results by state or country. It is not at all clear what interest the State of Minnesota has in mandating disclosures about social media usage worldwide.

58.     Regulations that govern global social media platforms, such as the compelled disclosure requirements of the Act, are inherently international in scope unless they are explicitly limited. The Act fails to include meaningful geographic limitations and thus applies just as much to use of the platforms by Texans, in Texas, or Australians, in Australia, as it does to Minnesotans, in Minnesota. And even if a Minnesotan uses a social media platform in Minnesota, their activity on the platform is nonetheless available globally and viewed globally.

59.     NetChoice's covered members will be forced to expend significant monetary and employee resources to comply with the Act, all for the unconstitutional and unjustifiable goal of pressuring NetChoice's covered members to speak in a way that Attorney General Ellison and the State of Minnesota would prefer.

60.     The legislative history of the Act reveals that at least one legislator argued that the Act would raise Commerce Clause problems if passed. As then-Representative Brian Johnson acknowledged, given the inherently cross-state and cross-border nature of social media, the requirements instituted by the Act should be done "at the federal level," given that they impact "interstate commerce." Ex. 2 (MNHouseInfo, *House Judiciary Finance and Civil Law Committee 3/14/24*, at 1:08:36–1:10:46 (YouTube, Mar. 14, 2024), https://www.youtube.com/watch?v=W2hg8wqK91E).

61.     He added that he was "not sure how [the law is] going to work" because Minnesota has "places across the state like Taylors Falls and Saint Croix Falls, Duluth and Superior, Fargo,

Moorhead, where if you're on one side of a bridge you're in Minnesota, and if you're on the other side of the bridge, you're in a different state.  Up in International Falls, you go across the border, you're in a different country."  *Id.*; *see also id.* ("[The companies] are going to have to put a geo fence around the entire border of the State of Minnesota.").  Representative Johnson voiced concerns that it would be "challenging" to address the "serious issue" targeted by the Act "without violating our constitution, both state and federal."  *Id.*  The Minnesota legislature passed the Act despite these expressed concerns.

## FIRST CAUSE OF ACTION

### (Declaratory Relief and Injunctive Relief for Violations of the First Amendment of the United States Constitution (42 U.S.C. § 1983) and Article I, Section 3, of the Minnesota Constitution—Facial and As-Applied)

62.    NetChoice realleges and incorporates herein by reference each and every allegation set forth above.

63.    The compelled disclosure requirements of the Act violate the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution[16] by compelling social media platforms to publicly divulge extremely sensitive, valuable trade-secret information, and to take positions in the ongoing, highly controversial debate about the proper use of emerging technologies by social media companies, in a manner framed by the State.

64.    The Act alters the content of NetChoice's covered members' speech by forcing them to speak a particular message that they otherwise would not.  *See, e.g.*, *X Corp.*, 116 F.4th at

---

[16] The Act violates Article I, Section 3, of the Minnesota Constitution for all of the same reasons that it violates the First Amendment of the United States Constitution.  *See Tatro* v. *Univ. of Minn.*, 816 N.W.2d 509, 516 (Minn. 2012) ("Because the Minnesota constitutional right to free speech is coextensive with the First Amendment, we look primarily to federal law for guidance."); *Minn. Majority* v. *Mansky*, 708 F.3d 1051, 1054 n.1 (8th Cir. 2013) ("[Minnesota Constitution claims] are evaluated using the same standard as those under the U.S. Constitution.").

900 (quoting *NIFLA*, 585 U.S. at 766) ("When a state 'compel[s] individuals to speak a particular message,' the state 'alter[s] the content of their speech,' and engages in content-based regulation.").

65.     The compelled disclosure requirements of the Act are also designed to pressure certain websites (through public pressure and government pressure) to change their product design and algorithms in the ways outlined in the AG 2024 and 2025 Reports.  Those changes directly seek to undermine NetChoice's covered members' commercial speech—i.e., efforts to communicate with users through product design and algorithms that are designed, in part, to urge them to continue to use the platforms.  At the very least, the compelled disclosure requirements target commercial speech that is "inextricably intertwined" with otherwise fully protected speech, which is subject to strict scrutiny.  *See Riley* v. *Nat'l Fed'n of the Blind*, 487 U.S. 781, 796 (1988); *see also X Corp.*, 116 F.4th at 902 (citing *Riley*, 487 U.S. at 796–97) ("The State suggests that this requirement is subject to lower scrutiny because 'it is *only* a transparency measure' about the product.  But even if [compelled disclosure] provisions concern only transparency, the relevant question here is: transparency into what?  Even a pure 'transparency' measure, if it compels non-commercial speech, is subject to strict scrutiny.") (emphasis in original); *id.* at 904 ("The government reasonably has an interest in transparency by social media platforms.  But even 'undeniably admirable goals' 'must yield' when they 'collide with the . . . Constitution.'").

66.     The Act is also speaker-based.  It targets certain websites while exempting other similar speakers, under Section 325M.31(j), such as streaming services and online video games. *See, e.g.*, *Sorrell*, 564 U.S. at 571 (laws that interfere with the speech rights of only certain speakers "justify application of heightened scrutiny" particularly when they are aimed at specific content). The Act cannot satisfy any type of heightened scrutiny.

67.     The Act would also flunk the test for intermediate scrutiny under *Central Hudson*, 447 U.S. 557.   The Act does not directly and materially advance, and is more extensive than necessary to serve, any purported governmental interest in limiting supposedly manipulative social media use.   For instance, Minnesotans will not benefit from knowing statistics about "***all*** platform account holders," which on the face of the Act would expand to users worldwide.   *See* § 325M.33(3).   And there is no evidence that compelled disclosures would do anything to help consumers decide which social media platforms to use.

68.     The test for compelled commercial disclosures set forth in *Zauderer*, 471 U.S. 626, does not apply.   The disclosures compelled by the Act are not purely factual and uncontroversial. Rather, they are designed to generate controversy to force NetChoice's covered members to change their policies surrounding their algorithms and how they keep users on the platform.   *See, e.g.*, *Jewell*, 526 F. Supp. 3d at 468 (expressing doubt as to whether *Zauderer* applies because the disclosure "appears to cross the line into compelled advocacy regarding a controversial issue"). NetChoice's covered members' algorithms are protected speech—*see, e.g.*, *Moody*, 603 U.S. at 744; *Junger*, 209 F.3d at 485; *Corley*, 273 F.3d at 436—and the Act attempts to generate controversy with the goal of changing, and lessening the effectiveness of, that protected speech. But the State may not accomplish "indirectly what [it] is barred from doing directly."   *Vullo*, 602 U.S. at 190.

69.     Even if the test set forth under *Zauderer* applied (and it does not), the Act would fail that level of scrutiny as well.

70.     The compelled disclosure requirements of the Act are facially invalid under the First Amendment because "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."   *Ams. for Prosperity Found.* v. *Bonta*,

594 U.S. 595, 615 (2021); *see also X Corp.*, 116 F.4th at 899 (finding facial challenge appropriate where disclosure requirements "raise[d] the same First Amendment issues" for every covered social media company).  They are also unconstitutional as-applied to NetChoice's covered members.

71.    There is a *bona fide* and actual controversy between NetChoice and Defendant because Defendant is charged with enforcing, and intends to enforce, the compelled disclosure requirements of the Act, even though they violate the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to NetChoice's covered members.

72.    NetChoice maintains that the compelled disclosure requirements of the Act are illegal and unconstitutional.  Defendant claims otherwise.

73.    NetChoice requests a judicial determination regarding the validity of the compelled disclosure requirements of the Act to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of NetChoice's covered members' constitutional rights, which would occur if the compelled disclosure requirements of the Act were applied to any of the members.

74.    Given the violation of the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, NetChoice seeks injunctive relief against enforcement of the compelled disclosure requirements of the Act.  NetChoice's covered members would be irreparably harmed if they were forced to comply with the Act's compelled disclosure requirements and have no adequate remedy at law.

## SECOND CAUSE OF ACTION

**(Declaratory Relief and Injunctive Relief for Violations of the First and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) for Vagueness)**

75.     NetChoice realleges and incorporates herein by reference each and every allegation set forth above.

76.     The compelled disclosure requirements of the Act are void for vagueness under the First and Fourteenth Amendments of the U.S. Constitution because they are so unintelligible that they "fail[] to provide a person of ordinary intelligence fair notice of what is prohibited" and are "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *Fantasysrus 2, L.L.C.*, 881 F. Supp. 2d at 1032 (quoting *Williams*, 553 U.S. at 304).

77.     NetChoice's covered members cannot understand what the Act requires.  Nor would "a person of ordinary intelligence."

78.     For instance, the Act's requirement to disclose "an explanation of how [it] limits excessive account interactions," *see* § 325M.33(1), including because "excessive" is undefined and websites will be unable to meaningfully comply without any indication of what the state may consider excessive.  In addition, the definition of "account interactions" in Section 325M.31(d)— "any action that a user can make within a social media platform that could have a negative impact on another account holder"—is vague in itself.  Although the Act provides examples of "account interactions," the term "***include[s] but [is] not limited to***" those examples, § 325M.31(d), which limits the utility of that guidance in determining what is and is not covered by the statute.

79.     A person of ordinary intelligence could not understand, for instance, the Act's requirement to disclose a description of the platform's "product experiments" and the "experimental conditions" used in those experiments, § 325M.33(5), including because both of those terms are undefined.

80.     A person of ordinary intelligence could not understand Section 325M.33(4)(i)'s disclosure requirement, because the statistics sought under that subsection are for a "given day," but that term is undefined.  Such statistics can vary greatly depending on the "day."

81.     Lastly, and exacerbating the Act's vagueness, is that the "Enforcement Authority" provision does not explain what type of relief may be sought by the Attorney General in an action against a social media platform.  *See* § 325M.34.  It is entirely unclear, for example, if the Attorney General can sue a platform for injunctive relief or something else.  It is also unclear whether the Attorney General may sue a platform that makes the requisite disclosures, but in a manner deemed insufficient by the Attorney General.  Accordingly, NetChoice's covered members cannot understand what the Act's enforcement provision authorizes.

82.     Due to the vagueness and ambiguity of these terms and phrases, the Act fails to provide "a reasonable opportunity to know what" the statute "prohibit[s]."  *D.C.* v. *City of St. Louis, Mo.*, 795 F.2d 652, 653 (8th Cir. 1986); *see also Village of Hoffman Ests.* v. *Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982) (applying "stringent vagueness test" to laws that "interfere[] with the right of free speech"); *NAACP* v. *Button*, 371 U.S. 415, 432 (1963) (holding that the "standards of permissible statutory vagueness are strict in the area of free expression").

83.     The Act "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *City of St. Louis*, 795 F.2d at 653 (emphasis in original); *see also Village of Hoffman Ests.*, 455 U.S. at 499; *Button*, 371 U.S. at 432.  This is particularly dangerous with the Act, given that Defendant is charged with enforcing it and has openly expressed animus toward social media platforms.

84.     There is a *bona fide* and actual controversy between NetChoice and Defendant because Defendant is charged with enforcing, and intends to enforce, the compelled disclosure requirements of the Act, even though they violate the First and Fourteenth Amendments of the United States Constitution for vagueness.

85.     NetChoice maintains that the compelled disclosure requirements of the Act are illegal and unconstitutional.  Defendant claims otherwise.

86.     NetChoice requests a judicial determination regarding the validity of the compelled disclosure requirements of the Act to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of NetChoice's covered members' constitutional rights, which would occur if the compelled disclosure requirements of the Act were applied to any of the members.

87.     Given the violation of the First and Fourteenth Amendments of the United States for vagueness, NetChoice seeks injunctive relief against enforcement of the compelled disclosure requirements of the Act.  NetChoice's covered members would be irreparably harmed if they were forced to comply with the Act's compelled disclosure requirements and have no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(Declaratory Relief and Injunctive Relief for Violations of the Takings Clause Under the Fifth and Fourteenth Amendments of the United States Constitution (42 U.S.C. § 1983) and Article 1, Section 13, of the Minnesota Constitution)**

88.     NetChoice realleges and incorporates herein by reference each and every allegation set forth above.

89.     The United States and Minnesota Constitutions prohibit the government from taking private property without just compensation.  As outlined above, Sections 325M.33(1),

32

325M.33(2), 325M.33(4), and 325M.33(5) of the Act compel the disclosure of information that is both highly confidential and a trade secret, and in which NetChoice's covered members have property interests.  The Act does not provide for any compensation.

90.    When "data [is] cognizable as a trade-secret property right under [state] law, that property right is protected by the Takings Clause[.]"  *Ruckelshaus* v. *Monsanto Co.*, 467 U.S. 986, 1003–04 (1984).   The algorithms of NetChoice's covered members are trade secrets under Minnesota law because (1) they are "neither generally known nor readily ascertainable," (2) they "derive independent economic value from [their] secrecy," and (3) the members "make reasonable efforts to maintain [their] secrecy."  *See, e.g.*, *Wyeth*, 2003 WL 22282371, at *19.

91.    Even if those algorithms were not trade secrets, NetChoice's covered members would still have a property interest in them, given that they are "[c]onfidential business information," which "has long been recognized as property" when "acquired or compiled by a corporation in the course and conduct of its business[.]"  *Carpenter* v. *United States*, 484 U.S. 19, 26 (1987).

92.    The Act effectuates a *per se* or categorical taking of the covered members' property because the members own an ***exclusive*** right to that property.  If NetChoice's covered members are forced to disclose their trade secrets to the public and their competitors, the value of that property right will be substantially diminished.

93.    There is a *bona fide* and actual controversy between NetChoice and Defendant because Defendant is charged with enforcing, and intends to enforce, the compelled disclosure requirements of the Act, even though they violate the Takings Clause under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 13, of the Minnesota Constitution.

94.     NetChoice maintains that the compelled disclosure requirements of the Act are illegal and unconstitutional.  Defendant claims otherwise.

95.     NetChoice requests a judicial determination regarding the validity of the compelled disclosure requirements of the Act to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of NetChoice's covered members' constitutional rights, which would occur if the compelled disclosure requirements of the Act were applied to any of the members.

96.     Given the violation of the Takings Clause under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 13, of the Minnesota Constitution, NetChoice seeks injunctive relief against enforcement of the compelled disclosure requirements of the Act.  NetChoice's covered members would be irreparably harmed if they were forced to comply with the Act's compelled disclosure requirements and have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Declaratory Relief and Injunctive Relief for Violations of the Dormant Commerce and Due Process Clauses of the United States Constitution (42 U.S.C. § 1983))

97.     NetChoice realleges and incorporates herein by reference each and every allegation set forth above.

98.     The Act violates the federal constitutional ban on state extraterritorial economic regulation under the Dormant Commerce Clause by imposing a requirement that a social media platform with over 10,000 account holders in Minnesota change its social media platform *universally*—not just for Minnesota's 10,000 account holders.  *See* § 325M.33 (disclosure requirements for "social media platforms"); § 325M.31(j) (defining "[s]ocial media platform"); §

325M.32(a)(2) (applying the Act's requirements to "social media platforms" with more than 10,000 monthly active account holders located in Minnesota).

99.     Only "social media platforms" with over 10,000 account holders in Minnesota are subject to the Act's compelled disclosure requirements. § 325M.32(a)(2). Social media platforms with 10,000 or fewer account holders are exempt. *See id.*

100.    Under Section 325M.31(c), "[a]ccount holder" means "a natural person or legal person who holds an account or profile with a social media platform."

101.    Thus, under an ordinary reading of Sections 325M.31 and 325M.33, if more than 10,000 monthly natural or legal persons hold an account or profile with a social media platform, the platform must comply with Section 325M.33 and make the compelled disclosures on its website ***universally***.  The Act thus goes beyond regulating the social media platform for only Minnesota-located account holders.

102.    If the state legislature had not intended this extraterritorial result, it would have used the same language in Section 325M.33 that it employed in Section 325M.32(b), for purposes of allowing platforms to "determine whether an account holder is located in Minnesota." *See* § 325M.32(b) ("[A] social media platform may determine whether an account holder is located in Minnesota based on: (1) the account holder's own supplied address or location; (2) global positioning system-level latitude, longitude, or altitude coordinates; (3) cellular phone system coordinates; (4) Internet protocol device address; or (5) other mechanisms that can be used to identify an account holder's location.").  But the legislature did not use any such language in Section 325M.33.

103.    In addition, the state legislature could have adopted the following bolded language to limit Section 325M.33:  "A social media platform must publicly and conspicuously post **for its**

**Minnesota-located account holders** the following information on the social media platform's website: . . . "

104.    But the state legislature failed to limit Section 325M.33's statutory obligations to Minnesota account holders, meaning that Section 325M.33 is an unconstitutional extraterritorial economic regulation that violates the Dormant Commerce Clause of the United States Constitution.

105.    The Act also violates the Dormant Commerce Clause because "the burden" it "impose[s] on interstate commerce" is "clearly excessive in relation to [its] putative local benefits." *Nat'l Pork Producers Council* v. *Ross*, 143 S. Ct. 1142, 1157 (2023) (quoting *Pike* v. *Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)); *see also Styczinski* v. *Arnold*, 46 F.4th 907, 912 (8th Cir. 2022) (a state statute violates the Dormant Commerce Clause if it "imposes a burden on interstate commerce that outweighs any benefits received").

106.    The Act imposes significant burdens on interstate commerce because it "regulat[es] [] activities that are inherently national or require a uniform system of regulation." *Nat'l Pork Producers Council* v. *Ross*, 6 F.4th 1021, 1031 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142; *see supra*, at ¶¶ 60–61 (Representative Johnson acknowledging that the Act should be instead be implemented "at the federal level" because it impacts "interstate commerce"). Those burdens, moreover, are "clearly excessive in relation to the putative local benefits." *Ross*, 6 F.4th at 1026 (quoting *Pike*, 397 U.S. at 142). Put differently, the Act places burdens on interstate commerce— by regulating global platform content—that far exceed the Act's supposed local benefits for Minnesotans.

107.    Since the compelled disclosures concern explanations and statistics about social media usage worldwide, and largely require no breakdown of disclosures that are applicable to

Minnesotans or Americans, they provide little to no benefits to Minnesotans. The burdens of complying with the compelled disclosure requirements of the Act are, in contrast, substantial. Compiling the statistics required will be extremely burdensome. And the compelled disclosures require making public confidential business information and trade secrets, as outlined above.

108.    The intent and likely effect of the Act's compelled disclosure requirement are to diminish the effectiveness of NetChoice's covered members' product designs and algorithms as a tool for urging users to use their platforms on a nationwide (or even worldwide) basis, not only in Minnesota.

109.    For these reasons, the Act's compelled disclosure requirements also violate the Due Process Clause of the U.S. Constitution. As the United States Supreme Court recently held in *Fuld* v. *Palestine Liberation Org.*, 2025 WL 1716140, at *8–9 (U.S. June 20, 2025), "[t]he Constitution confers upon the Federal Government—and it alone—both nationwide and extraterritorial authority" and "due process protects the individual's right to be subject only to lawful power." The Act's compelled disclosure requirements impermissibly authorize the State to utilize nationwide and extraterritorial authority, thus violating the Due Process rights of NetChoice's covered members.

110.    There is a *bona fide* and actual controversy between NetChoice and Defendant because Defendant is charged with enforcing, and intends to enforce, the compelled disclosure requirements of the Act universally, even though they violate the Dormant Commerce and Due Process Clauses of the United States Constitution.

111.    NetChoice maintains that the compelled disclosure requirements of the Act are illegal and unconstitutional. Defendant claims otherwise.

112.     NetChoice requests a judicial determination regarding the validity of the compelled disclosure requirements of the Act to prevent the harm caused by their enactment.  Such a determination is both necessary and appropriate to avoid the deprivation of NetChoice's covered members' constitutional rights, which would occur if the compelled disclosure requirements of the Act were applied to any of the members.

113.     Given the violation of the Dormant Commerce and Due Process Clauses of the United States Constitution, NetChoice seeks injunctive relief against enforcement of the compelled disclosure requirements of the Act.  NetChoice's covered members would be irreparably harmed if they were forced to comply with the Act's compelled disclosure requirements and have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, NetChoice respectfully requests that this Court enter judgment in NetChoice's favor and grant the following relief:

1.     A declaration that the Act violates the First Amendment of the United States Constitution and Article I, Section 3, of the Minnesota Constitution, both facially and as-applied to NetChoice's covered members;

2.     A declaration that the Act violates the First and Fourteenth Amendments of the United States Constitution for vagueness;

3.     A declaration that the Act violates the Takings Clause under the Fifth and Fourteenth Amendments of the United States Constitution and Article 1, Section 13, of the Minnesota Constitution;

4.     A declaration that the Act violates the United States Constitution's ban on a state enacting extraterritorial economic regulations;

5.       A declaration that the Act violates the Dormant Commerce Clause of the United States Constitution;

6.       A declaration that the Act violates the Due Process Clause of the United States Constitution;

7.       A preliminary and permanent injunction enjoining Defendant and his employees, agents, and successors in office from enforcing the Act;

8.       An award of fees, costs, expenses, and disbursements, including attorneys' fees, to which NetChoice is entitled pursuant to 42 U.S.C. § 1988 and other applicable law; and

9.       Such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, NetChoice demands a trial by jury in this action of all issues so triable.

Dated:   June 30, 2025

By: /s/ Erick G. Kaardal
    Erick G. Kaardal (SBN 229647)
    MOHRMAN, KAARDAL & ERICKSON, P.A.
    150 S. Fifth St., Ste. 3100
    Minneapolis, MN 55402
    Phone: 612-746-7724
    Facsimile: 612-341-1076
    kaardal@mklaw.com

    CAHILL GORDON & REINDEL LLP
    Joel Kurtzberg (*pro hac vice pending*, SBN NY 2835007)
    Floyd Abrams (*pro hac vice pending*, SBN NY 1758184)
    Jason Rozbruch (*pro hac vice pending*, SBN NY 5753637)
    32 Old Slip
    New York, NY 10005
    Phone: 212-701-3120
    Facsimile: 212-269-5420
    jkurtzberg@cahill.com
    fabrams@cahill.com
    jrozbruch@cahill.com