# Exhibit 5

CASE 0:25-cv-02741-NEB-SGE   Doc. 1-5   Filed 06/30/25   Page 2 of 8

This Document can be made available
in alternative formats upon request

State of Minnesota

# HOUSE OF REPRESENTATIVES

**NINETY-THIRD SESSION**  **H. F. No. 4400**

| | |
|---|---|
| 02/28/2024 | Authored by Stephenson and Bahner |
| | The bill was read for the first time and referred to the Committee on Commerce Finance and Policy |
| 03/07/2024 | Adoption of Report: Re-referred to the Committee on Judiciary Finance and Civil Law |

A bill for an act

relating to consumer protection; creating the Prohibiting Social Media Manipulation Act; regulating social media platforms; providing a private right of action and attorney general enforcement; proposing coding for new law as Minnesota Statutes, chapter 325O.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MINNESOTA:

Section 1. **[325O.01] CITATION.**

This chapter may be cited as the "Prohibiting Social Media Manipulation Act."

Sec. 2. **[325O.02] DEFINITIONS.**

(a) For purposes of this chapter, the following terms have the meanings given.

(b) "Accessible user interface" means a way for a user to input data, make a choice, or take an action on a social media platform in two clicks or less.

(c) "Account holder" means a natural person or legal person who holds an account or profile with a social media platform.

(d) "Algorithmic ranking system" means a computational process, including one derived from algorithmic decision making, machine learning, statistical analysis, or other data processing or artificial intelligence techniques, used to determine the selection, order, relative prioritization, or relative prominence of content from a set of information that is provided to a user on a social media platform, including search results ranking, content recommendations, content display, or any other automated content selection method.

(e) "Click" means an act of selecting an option on an electronic interface by pressing a button, touching a screen, making a gesture, issuing a voice command, or other means.

(f) "Content" means any media, including but not limited to written posts, images, visual or audio recordings, notifications, and games, that a user views, reads, watches, listens to, or otherwise interacts or engages with on a social media platform. Content includes other account holders' accounts or profiles when recommended to a user by the social media platform.

(g) "Default" means a preselected option adopted by a social media platform for the social media platform's service, product, or feature.

(h) "Device operating system provider" means a business that manages or develops operating system software for mobile or desktop devices, including but not limited to personal computers, smartphones, and tablets, which manage device resources and are loaded by a boot program.

(i) "Engage" or "engagement" means a user's utilization of the social media platform.

(j) "Existing extended network" means a user's existing network plus the set of account holders on a social media platform who are all directly connected to the account holders within that user's existing network.

(k) "Existing network" means the set of account holders on a social media platform with whom a user has consented to have a direct connection.

(l) "Expressed preferences" means a freely given, considered, specific, and unambiguous indication of a user's preferences regarding the user's engagement with a social media platform. Expressed preferences cannot be based on the user's time spent engaging with content on the social media platform, nor on the usage of features that do not indicate explicit preference, such as comments made, posts reshared, or similar actions that may be taken on content the user perceives to be of low quality. Expressed preferences may not be obtained through a user interface designed or manipulated with the substantial effect of subverting or impairing a user's decision making.

(m) "Optimize" means promoted, prioritized, or maximized by a social media platform's algorithmic ranking system.

(n) "Relevant forms of engagement with users" includes but is not limited to:

(1) sending invitations or messages to users;

(2) commenting on, resharing, liking, voting, or otherwise reacting to users' user-generated content; and

(3) disseminating user-generated content to users.

Sec. 2.                                  2

3.1      (o) "Social media platform" means an electronic medium, including a browser-based or

3.2 application-based interactive computer service, telephone network, or data network, that

3.3 allows an account holder to create, share, and view user-generated content. Social media

3.4 platform does not include: (1) Internet search providers, Internet service providers, email,

3.5 or short-message-service; (2) streaming video service or other Internet website where the

3.6 content is not user-generated but where interactive functions enable incidental chat,

3.7 comments, or reviews; or (3) a communication service, including audio and video

3.8 communication technology, provided by a business to the business's employees and clients

3.9 for use in the course of business activities and not for public distribution. Social media

3.10 platform includes a messaging service that is owned by a company that operates a social

3.11 media platform.

3.12     (p) "Time sensitive" means content that is welcomed under a user's expressed preferences

3.13 and that would have significantly reduced value to the user with the passing of time.

3.14     (q) "User" means a natural person who is located in Minnesota and who holds an account

3.15 or profile with a social media platform.

3.16     (r) "User-generated content" means any content created by an account holder that is

3.17 uploaded, posted, shared, or disseminated on the social media platform.

3.18     (s) "Varied set of account holders" means a set of account holders who have different

3.19 behaviors and histories.

3.20     Sec. 3. **[325O.03] SCOPE; EXCLUSIONS.**

3.21     (a) A social media platform is subject to this chapter if the social media platform:

3.22     (1) does business in Minnesota or provides products or services that are targeted to

3.23 residents of Minnesota; and

3.24     (2) has more than 10,000 monthly active users.

3.25     (b) For purposes of this chapter, a social media platform may determine whether an

3.26 account holder is located in Minnesota based on:

3.27     (1) the account holder's own supplied address or location;

3.28     (2) global positioning system-level latitude, longitude, or altitude coordinates;

3.29     (3) cellular phone system coordinates;

3.30     (4) Internet protocol device address; or

3.31     (5) other mechanisms that can be used to identify an account holder's location.

Sec. 3.                                  3

4.1     Sec. 4. **[325O.04] REQUIREMENTS FOR SOCIAL MEDIA PLATFORMS.**

4.2     Subdivision 1. **Content optimization.** (a) A social media platform must provide an
4.3 accessible user interface that allows a user to clearly indicate whether a particular piece of
4.4 content:

4.5     (1) is of high or low quality; and

4.6     (2) complies with the user's expressed preferences.

4.7     (b) A social media platform's algorithmic ranking system must optimize content for a
4.8 user that:

4.9     (1) a varied set of account holders indicates is of high quality; and

4.10    (2) complies with a user's expressed preferences.

4.11    (c) A social media platform's algorithmic ranking system must not optimize content that
4.12 is not related to a user's expressed preferences in order to maximize the user's engagement
4.13 with the platform.

4.14    Subd. 2. **Account holder daily limits.** (a) A social media platform must develop criteria
4.15 to designate an account holder who has recently created an account with or joined the social
4.16 platform as a new account holder. An account created within 30 days must be considered
4.17 a new account holder. For a new account holder, a social media platform must set daily
4.18 numerical limits on relevant forms of engagement with users equivalent to the 50th percentile
4.19 of all platform account holders.

4.20    (b) For all account holders, a social media platform must set daily numerical limits on
4.21 relevant forms of engagement with users equivalent to the two standard deviations above
4.22 the median for all platform account holders. A limit required under this paragraph may
4.23 allow an account holder to have relevant forms of engagement with users in excess of the
4.24 limit, but at a minimum must reduce the impact of the engagement on other users. A limit
4.25 may be exceeded for interactions with another user if the other user clearly initiates and
4.26 welcomes the engagement.

4.27    Subd. 3. **Default privacy settings.** (a) A social media platform must provide default
4.28 settings for a user that do not:

4.29    (1) allow the user's account or the user's user-generated content to be discovered by
4.30 anyone outside the user's existing extended network;

(2) allow messaging, requests, reactions, comments, or other contact from an account holder that is not already within the user's existing extended network, unless the user initiates and welcomes the contact;

(3) reveal the user's location outside the user's existing network, unless the user specifically shares the user's location outside the user's existing network;

(4) disseminate any information about the user, including the user's profile and any of the user's user-generated content, to anyone outside of the user's existing network without a specific request from the user to disseminate the information; or

(5) allow or facilitate a user's user-generated content, or any user's facial or biometric data, to be incorporated into generative artificial intelligence models without the user's explicit consent.

(b) The default settings required in paragraph (a) may be changed only to comply with the user's expressed preferences. A social media platform must not utilize a system, user interface, or prompt that encourages a user to change the user's privacy settings toward allowing the user's information or user-generated content to be shared or disseminated more broadly.

Subd. 4. **Option for heightened protection.** (a) A social media platform must provide an accessible user interface to allow a user to opt in to any or all of the heightened protection requirements under paragraph (d). A social media platform may make the heightened protections the default settings for all users or all account holders.

(b) A device operating system provider must provide an option for a user to automatically opt in to any or all of the heightened protection requirements under paragraph (d) across all social media platforms managed by the operating system on the user's device. If a user selects the option under this paragraph, the device operating system provider must (1) inform all social media platforms managed by the provider's operating system of the user's preference, and (2) adjust the user's account to provide the heightened protections. A device operating system provider may provide a user the ability to opt out of any or all heightened protections.

(c) A device operating system provider must, by default, consider any device with parental controls enabled to have opted in to all the heightened protection requirements under paragraph (d).

(d) For a user receiving heightened protections, a social media platform must not:

Sec. 4.                            5

6.1      (1) use platform features that increase, sustain, or extend a user's engagement with the

6.2   platform beyond the user's expressed preferences regarding time or duration. Features subject

6.3   to this clause include but are not limited to:

6.4      (i) optimization for time spent or content consumed;

6.5      (ii) content feeds without finite endings;

6.6      (iii) autoplaying videos or other content; and

6.7      (iv) notifications that are not time sensitive; or

6.8      (2) provide any visible count showing how much engagement content that the user

6.9   viewed, consumed, or generated has received.

6.10     Subd. 5. **Transparency requirements.** (a) A social media platform must publicly post

6.11  the following information on the social media platform's website:

6.12     (1) an explanation of how the social media platform designates new account holders and

6.13  an explanation detailing the operation and effect of usage limits applicable to new account

6.14  holders under subdivision 2, paragraph (a);

6.15     (2) an explanation detailing the operation and effect of the usage limits required under

6.16  subdivision 2, paragraph (b);

6.17     (3) an explanation detailing how the platform:

6.18     (i) assesses users' perceptions of the quality of content;

6.19     (ii) assesses users' expressed preferences regarding content; and

6.20     (iii) utilizes the assessments under items (i) and (ii) in the social media platform's

6.21  algorithmic ranking system, including how these assessments are weighted in relation to

6.22  other signals in the algorithmic ranking system;

6.23     (4) statistics on the platform's use with respect to the tenth, 25th, 50th, 75th, 90th, 95th,

6.24  99th, and 99.9th percentile of all platform account holders for relevant forms of engagement,

6.25  including but not limited to:

6.26     (i) sending invitations or messages to other platform account holders;

6.27     (ii) commenting on, resharing, liking, voting for, or otherwise reacting to content;

6.28     (iii) posting new user-generated content; and

6.29     (iv) disseminating user-generated content to other platform account holders;

6.30     (5) an explanation of how the platform determines whether a notification is time sensitive;

7.1      (6) an explanation of how the platform determines what constitutes a "varied set of

7.2   account holders," including what behaviors are used as signals and how any measurement

7.3   of difference is created and used; and

7.4      (7) a description of all product experiments that have been conducted on 1,000 or more

7.5   users, including the results of the product experiments on users' engagement with content

7.6   that:

7.7      (i) users indicate to be high or low quality;

7.8      (ii) users indicate complies or does not comply with the users' expressed preferences;

7.9   and

7.10     (iii) violates platform policies.

7.11     (b) When automatically delivering, suggesting, or selecting content to a user, a social

7.12  media platform must provide an accessible user interface to allow the user to access a basic,

7.13  nontechnical explanation detailing why a particular piece of content was promoted by the

7.14  platform's algorithmic ranking system.

7.15     Sec. 5. **[325O.05] ENFORCEMENT.**

7.16     (a) In addition to the remedies otherwise provided by law, a person injured by a violation

7.17  of this chapter may bring a civil action against a social media platform and recover damages,

7.18  together with costs and disbursements, including reasonable attorney fees, and receive other

7.19  equitable relief determined by the court. In addition to any other damages and relief awarded,

7.20  a social media platform that violates this chapter may be liable for a civil penalty of not

7.21  more than $10,000 per violation.

7.22     (b) The attorney general may bring a civil enforcement action and recover the relief

7.23  provided in section 8.31 against a social media platform that violates this chapter.

7.24     Sec. 6. **[325O.06] SEVERABILITY.**

7.25     If any provision of this chapter or the chapter's application to any person or circumstance

7.26  is held invalid for any reason in a court of competent jurisdiction, the remainder of the

7.27  chapter or the application of the provision to other persons or circumstances is not affected.

7.28     Sec. 7. **EFFECTIVE DATE.**

7.29     This act is effective July 1, 2025.